IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KHALED BATAINEH,

      Petitioner,

      v.                                CASE NO.  20-3132-JWL

WESLEY LUNDGREN, et al.,

      Respondents.

**MEMORANDUM AND ORDER**

This matter is a petition for writ of habeas corpus filed under 28 U.S.C. § 2241. Petitioner is detained at the Chase County Jail in Cottonwood Falls, Kansas ("CCJ"), pending removal proceedings. Petitioner raises four grounds for relief:  1) that his mandatory detention violates  procedural due process in light of his viable legal defenses to removal; 2) his prolonged detention violates procedural due process; 3) his detention is in violation of substantive due process under the Fifth Amendment; and 4) he is being subjected to unconstitutional conditions of confinement due to the COVID-19 pandemic.  Petitioner seeks immediate release or a bond hearing before an Immigration Judge within 15 days to consider release on bond or conditional parole.  (Doc. 1, at 20.)

## I.  Background[1]

Petitioner is a native and citizen of Jordan. (Doc. 4–1, at 2) (Declaration of Deportation Officer Charles Wekamp, ¶ 5) (hereinafter "Wekamp Decl."). On August 10, 2009, after Petitioner had attained permanent legal resident status, Petitioner was convicted in the state of Illinois of two counts of the offense of "Manufacture/Deliver Cannabis," in violation of Chapter 720, Illinois Compiled Statutes 550/5-C, a class 4 felony under Illinois law. *See*

---

[1]  Petitioner has agreed to the Respondents' factual and procedural background as set forth in the Respondents' Answer at Doc. 4, pages 1–12.  *See* Petitioner's Traverse, Doc. 5, at p. 1.

Wekamp Decl., ¶¶ 9, 24; *People of the State of Illinois v. Khaled M.R. Bataineh*, Case No. 2008CF002470 (Docket), Attachment B; 720 ILCS 550/5(c) (West 1997).

***Removal Proceedings***

On June 12, 2019, Petitioner presented for inspection at the Chicago O'Hare International Airport, bearing a Jordanian passport and a validly issued I-551, Permanent Resident Card. Wekamp Decl., ¶ 6. Customs and Border Protection ("CBP") referred Petitioner to secondary inspection for status verification and a criminal history review by a CBP officer. Wekamp Decl., ¶ 7. The inspection was deferred so that Petitioner's criminal history could be verified and a determination made regarding whether Petitioner was inadmissible under 8 U.S.C. § 1182(a)(2)(A) or deportable under 8 U.S.C. § 1227(a)(2)(A). Wekamp Decl., ¶ 8.

After receiving court documents from the Circuit Court of Will County, Illinois, confirming the two convictions under 720 ILCS 550/5(c), Petitioner was served with (1) a Form I-200, Warrant of Arrest, (2) a Form I-286, Notice of Custody Determination, and (3) a Form I-862, Notice to Appear ("NTA"). Wekamp Decl., ¶¶ 9, 11. On the same day, July 17, 2019, ERO took custody of Petitioner, placing him in the Pulaski County Detention Center in Ullin, Illinois. Wekamp Decl., ¶ 13.

On or about July 26, 2019, the ICE Office of the Principal Legal Advisor ("OPLA") filed the NTA with the Chicago Immigration Court, beginning removal proceedings. Wekamp Decl., ¶ 25. Just five days later, Petitioner appeared before the Immigration Judge, represented by counsel. Wekamp Decl., ¶ 26. Petitioner represented that he was seeking post-conviction relief relating to his 2009 conviction in the Circuit Court of Will County, Illinois, and removal proceedings were continued to September 9, 2019. Wekamp Decl., ¶ 26. On September 9, 2019, Petitioner again appeared in Immigration Court and, through counsel, informed the Immigration

Court that documents related to the post-conviction relief sought by Petitioner had been filed; removal proceedings were again continued to October 23, 2019.  Wekamp Decl., ¶ 27.

On October 23, 2019, Petitioner appeared for a third time in Immigration Court, again represented by counsel.  Wekamp Decl., ¶ 28.  At the October 23, 2019 hearing, the Immigration Judge sustained the charge of inadmissibility under 8 U.S.C. § 1182(a)(2)(A)(i)(II) contained on the NTA, and Petitioner requested a three-month continuance of the removal proceedings. Wekamp Decl., ¶ 28.  At that time, Petitioner's request for post-conviction relief remained pending in the Circuit Court of Will County, Illinois.  Wekamp Decl., ¶ 28. The Immigration Judge declined to grant the full three-month continuance, but continued proceedings to December 20, 2019—a 58 day continuance.  Wekamp Decl., ¶ 28.

On December 20, 2019, Petitioner appeared in Immigration Court, and submitted an application for relief from removal.  Wekamp Decl., ¶ 29.  The Immigration Judge continued the removal case to January 17, 2020.  Wekamp Decl., ¶ 29.  At the January 17, 2020 hearing, the Court was informed that the Circuit Court of Will County, Illinois had denied Petitioner's request for post-conviction relief.  Wekamp Decl., ¶ 32.  The Immigration Judge set the final hearing on Petitioner's request for relief from removal for March 3, 2020.  Wekamp Decl., ¶ 32.

After hearing testimony on March 3, 2020, the Immigration Judge denied Petitioner's request for relief from removal and ordered Petitioner removed to Jordan, terminating his Lawful Permanent Resident status.  Wekamp Decl., ¶ 34.  Petitioner was informed of his right to appeal this decision within 30 days.  Wekamp Decl., ¶ 34.  Petitioner appealed to the BIA and his appeal is currently pending with briefing due June 30, 2020.  (Doc. 10–1, at 2.)

***Petitioner's Medical Status***

Petitioner arrived at the CCJ in Cottonwood Falls, Kansas, his current location, on

April 8, 2020. Wekamp Decl., ¶ 37. Petitioner's transfer to the CCJ occurred as part of an attempt to minimize the spread of COVID-19, and was initiated by Chicago-ERO (Enforcement and Removal Operations) prior to the release of the *ERO COVID-19 Pandemic Response Requirements* ("PRR") on April 10, 2020. Wekamp Decl., ¶¶ 37, 39.[2]   The PRR sets forth expectations and assists ICE detention facility operators to sustain detention operations, while also mitigating risk from COVID-19.   As part of this dynamic guidance, ERO's Assistant Director of Field Operations, Peter Berg, issued expanded guidance directing the ERO field offices to review the custody of subgroups of detainees to determine whether the alien's COVID-19 risk outweighed continued detention.   The delineated subgroups included: (1) pregnant detainees or those who have delivered within the prior two-weeks; (2) detainees over 60 years old; and (3) detainees having any chronic illness that may make them immune-compromised, including but not limited to, blood disorders, chronic kidney disease, compromised immune systems, endocrine disorders, metabolic disorders, heart disease, lung disease, and/or neurological or neurodevelopmental disorders.  Wekamp Decl., ¶ 39.

During his medical screenings when booked into ICE facilities, Petitioner claimed to have a plate and screws in his right ankle and indicated that he took three medications for anxiety, depression, and high cholesterol, respectively—Petitioner did not indicate that he suffered from any other medical conditions.  Wekamp Decl., ¶ 40.  Based on the information known to ICE, Petitioner does not have a medical condition identified in one of the sub-groups identified in the PRR.  Wekamp Decl., ¶¶ 39, 41.  Nor do ICE records reflect Petitioner as having any medical or psychiatric diagnoses implicated in the class or subclass defined in the class

---

[2]   The PRR is attached as Ex. 2 to the Sigler Declaration, and is also available at: https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

action identified in *Fraihat et al. v. U.S. Immigration & Customs Enforcement, et al.*, Case No. 19-1546 (C.D. Cal.).  Wekamp Decl., ¶¶ 42-43.

Petitioner also received a physical within the first 14 days of his arrival at the CCJ. (Doc. 4–3, at 10) (Declaration of Chase County Jail Administrator Larry Sigler, ¶ 43) (hereinafter "Sigler Decl."). The CCJ has received no information or indication to suggest Petitioner suffers from severe obesity, colorectal bleeding, or hypertension.  Sigler Decl., ¶ 43. Petitioner's blood sugar levels were within the regular range during his physical and he does not have a diagnosis of diabetes.  Sigler Decl., ¶ 43.  Petitioner has a diagnosis of hyperlipidemia (high cholesterol), and due to this condition has his blood pressure checked daily to ensure normal blood pressure readings—a precautionary measure taken for all inmates with high cholesterol.  Sigler Decl., ¶ 43.

The CCJ is in compliance with the guidance issued by ICE ERO to detention facilities that house ICE detainees, including mandatory reporting and identification requirements relating to detainees that meet the CDC's identified populations potentially being at higher risk for serious illness from COVID-19.  Sigler Decl., ¶¶ 40-41.  Petitioner does not fall within the CDC's identified populations potentially being at higher-risk for serious illness from COVID-19 because he is under the age of 65 and has not been diagnosed with any underlying medical conditions noted by the CDC as being higher risk for COVID-19.  Sigler Decl., ¶ 42.

***Conditions at the CCJ***

The CCJ has an Intergovernmental Services Agreement ("IGSA") with ICE ERO, and has housed immigration detainees since 2008.  Sigler Decl., ¶ 9.  The CCJ is a correctional facility located in Chase County, Kansas, capable of housing 150 inmates.  Sigler Decl., ¶ 8.  The CCJ currently houses 70 inmates, which represents approximately 47% of the CCJ's capacity.

Sigler Decl., ¶ 8.  The number of inmates housed at the CCJ has been reduced since April 15, 2020, in an effort to limit inmate population due to the COVID-19 pandemic, and it is not anticipated that the inmate population will increase significantly in the foreseeable future.  Sigler Decl., ¶ 8.  The CCJ has reduced the number of other counties from which it accepts inmates and now only accepts inmates from Morris County, Kansas, in addition to those inmates from Chase County.  Sigler Decl., ¶ 11.  Of the 70 inmates currently housed at the CCJ, 65 are immigration detainees and 5 are county inmates.  Sigler Decl., ¶ 10.

As of May 25, 2020, the State of Kansas has reported 9,218 cases of COVID-19 in the state, resulting in 188 deaths.[3]  Sigler Decl., ¶ 4.  Chase County, Kansas has seen only four positive cases of COVID-19 within the county, which equates to a case rate of 1.51 cases per 1,000 people; of the four cases, three individuals have recovered.  Sigler Decl., ¶¶ 6-7.  The CCJ has implemented numerous precautions to protect inmates from the COVID-19 pandemic.

Beginning March 20, 2020, the CCJ adapted its procedures to limit the risk of COVID-19 exposure to inmates.  Sigler Decl., ¶ 12.  The CCJ has been closed to the public and all inmate visitation privileges have been suspended since March 19, 2020.  Sigler Decl., ¶ 13.  All inmate court appearances occur remotely via video from within a courtroom located in the CCJ, in an effort to limit contact between inmates and people outside of the facility, and the courtroom is cleaned and sanitized between dockets.  Sigler Decl., ¶ 14.  The only people who enter the CCJ, other than CCJ staff members, are ICE agents bringing in detainees or emergency maintenance workers, if necessary.  The ICE agents and emergency workers are temperature checked upon entry to the building and wear masks at all times.  Sigler Decl., ¶ 15.

---

[3] The website for the Kansas Department of Health and Environment shows the following state totals as of June 29, 2020:  14,443 cases; 1,152 hospitalizations; 270 statewide deaths; and 162,282 negative tests.  The website reflects four total cases in Chase County as of that date.  See https://www.coronavirus.kdheks.gov/160/COVID-19-in-Kansas (last visited July 1, 2020).

The CCJ employs approximately 30 staff members, including correctional officers, medical staff, and kitchen staff. Each staff member receives a medical screening upon arrival at the CCJ. Sigler Decl., ¶ 16. Medical personnel conduct the screening, which includes a temperature check and questioning, consistent with CDC guidelines, to determine whether the employee displays any signs or symptoms of COVID-19. Sigler Decl., ¶ 16. If an employee has a temperature of 100º or higher or shows any other signs or symptoms of COVID-19, the employee will be sent home to quarantine and all medical staff and inmates who have been in close contact with the potentially positive employee will continue to be screened. Sigler Decl., ¶ 16. Staff members wear masks at all times when in contact with inmates regardless of the length of time of the contact, and also wear masks when in confined areas with other staff members. Sigler Decl., ¶ 17. Staff members have been educated regarding the signs and symptoms of COVID-19 and the importance of disinfecting communal spaces. Sigler Decl., ¶ 17. No CCJ staff member or inmate has tested positive for COVID-19. Sigler Decl., ¶ 18.

The CCJ is divided into one open dorm that houses up to 20 inmates, eight pods that each house up to 16 inmates, one pod that houses up to four inmates, and five segregated cells that each house up to two inmates. Sigler Decl., ¶ 19.[4] Petitioner is currently housed in K Pod, and all inmates housed in that Pod have been housed in the CCJ for over one month. Sigler Decl., ¶ 39.

Restrooms and showers are located within the separated spaces and are not shared between inmates housed in different pods. Sigler Decl., ¶ 19. Meals are served to inmates in their dorm or pod and no communal cafeteria is used. Sigler Decl., ¶ 19. The only facilities used by inmates outside of their pods are the recreation yard and the courtroom. Sigler Decl., ¶ 20.

---

[4] As noted above, the CCJ is currently operating at approximately 47% capacity with only 70 inmates.

Inmates of one pod do not use the recreation yard or the courtroom at the same time as an inmate from another pod, and the areas are disinfected before and after access by members of different pods.  Sigler Decl., ¶ 20.

Beginning March 20, 2020, in response to the COVID-19 pandemic, the CCJ started a 14-day cohorting procedure for new inmates.[5]  Sigler Decl., ¶ 21.  When inmates arrive from another facility, instead of being housed with existing inmates, as was the procedure prior to the COVID-19 pandemic, the group of new inmates is cohorted for at least 14 days.  Sigler Decl., ¶ 22.  If 14 days pass without any inmate in the cohort showing symptoms of COVID-19, the inmates are removed from the cohort and housed with other inmates outside of the cohort.  Sigler Decl., ¶ 22.  If one person in a cohort shows symptoms of COVID-19, the person will be removed from the cohort and placed in a segregated cell and the remaining cohort will remain isolated until 14 days pass without any inmate showing symptoms of COVID-19.  Sigler Decl., ¶ 22.  Two of the nine pods at the CCJ are currently reserved for cohorting.  Sigler Decl., ¶ 22.  In addition to screenings for COVID-19, each new inmate receives a full physical within the 14-day cohorting period.  Sigler Decl., ¶ 23.  The last inmate to arrive at the CCJ prior to initiation of the cohorting procedure arrived on March 10, 2020, and was placed in a pod on March 14, 2020.  Sigler Decl., ¶ 24.

In the event an inmate within Petitioner's pod shows signs or symptoms of COVID-19, the inmate will be removed from the pod and placed in a segregated cell.  Sigler Decl., ¶ 25.  The inmate will then be tested for COVID-19 and, if the results are positive, will remain separated from the other inmates until the inmate no longer poses a risk of infecting others.  Sigler Decl., ¶ 25.  The remaining members of the pod will be continually screened for signs and symptoms of

---

[5] Cohorting refers to the practice of isolating inmates as a group to minimize interaction of individuals who may be infected or may have been exposed to COVID-19 from non-infected individuals.

COVID-19.  Sigler Decl., ¶ 25.  In the event the number of confirmed cases exceeds the number of segregated spaces available in the CCJ, ICE will be notified promptly so that inmates may be transferred to other facilities.  Sigler Decl., ¶ 26.

The Chase County Health Department has indicated COVID-19 tests are available and the CCJ has had no problem obtaining testing for the one employee and three inmates that have been tested.  Sigler Decl., ¶ 27.

Medical staff at the CCJ consists of a registered nurse on duty from 7:00 a.m. to 3:00 p.m., Monday through Friday, and on call 24/7, a certified medical assistant on duty on the weekends, and a doctor on call daily until 10:30 p.m.  Sigler Decl., ¶ 28.  Medical staff visit each pod at least once a day to provide medication and care and to respond to any questions or health concerns of inmates.  Sigler Decl., ¶ 29.  Opportunity for open dialog with medical staff is available at these times, and an inmate need not make a special request to discuss questions or concerns.  Sigler Decl., ¶ 29.  Medical care is also available to inmates upon request, and inmates are encouraged to seek medical care if they fall ill.  Sigler Decl., ¶ 29.

Notices furnished by ICE and printed from the CDC website in English and Spanish were posted in each pod on March 20, 2020.  Sigler Decl., ¶ 30.  The notices provide recommendations to help prevent the spread of respiratory diseases like COVID-19 and guidance on how inmates can protect themselves from COVID-19.  Sigler Decl., ¶ 30.  These notices include information about the importance of hand-washing and hand hygiene, avoiding close contact with other people, covering coughs and sneezes with a tissue instead of hands, avoiding touching the eyes, nose, and mouth, and disinfecting commonly used surfaces.  Sigler Decl., ¶ 30.  The notices also provide education regarding the symptoms of COVID-19 and encourage anyone showing the signs to seek medical attention.  Sigler Decl., ¶ 30.

All inmates at the CCJ are provided with soap and shampoo twice weekly and encouraged to clean themselves daily. Sigler Decl., ¶ 31. Petitioner has unlimited access to the shower facilities in his pod, except during nighttime lockdown. Sigler Decl., ¶ 31. In the event an inmate runs out of personal cleaning products before the next scheduled distribution, the inmate need only request additional cleaning products by filling out an Inmate Communication Request form and handing it to the correction officer on duty. Sigler Decl., ¶ 32.

In addition to personal cleaning products, the CCJ also provides a cleaning cart in each pod, which contains disinfectant, spray bottles, mops, rags, and paper towels for inmates to clean their cells and other surfaces in the pod. Sigler Decl., ¶ 35. If the cleaning cart runs out of supplies, an inmate need only push a button to notify the correction officer on duty and the supply will be replenished. Sigler Decl., ¶ 35. The CCJ was well-stocked in cleaning supplies prior to the COVID-19 pandemic and has not faced a shortage of cleaning supplies as a result of COVID-19. Sigler Decl., ¶ 36. Personal clothing is changed and laundered daily, uniforms are changed and laundered three times per week, and bedding is laundered once per week. Sigler Decl., ¶ 37.

Inmate Communication & Request Forms are available for inmates to communicate with corrections officers and medical staff. Sigler Decl., ¶ 38. The form directs the inmate to circle one of the following types of communication: Appeal, Request, Medical, Attorney Call, Grievance, Law Library, or Property Release, and provides places for the inmate to further describe the purpose of the request, as well as a place for the responding officer to write a response. Sigler Decl., ¶ 38. These forms can be used by inmates to request additional cleaning supplies, request medical attention or care, or convey grievances regarding the condition of the pods, inadequate supplies, or inadequate medical attention. Sigler Decl., ¶ 38.

The CCJ is familiar with all applicable COVID-19 related guidance, including the *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* issued by the CDC, and is committed to taking all reasonable steps to ensure the health and safety of all inmates at the CCJ.  Sigler Decl., ¶¶ 44-45; Ex. 3 to Sigler Decl.

## II. Discussion

To obtain habeas corpus relief, a petitioner must demonstrate that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3). The federal district courts have habeas corpus jurisdiction to consider the statutory and constitutional grounds for immigration detention that are unrelated to a final order of removal. *Demore v. Kim*, 538 U.S. 510, 517–18 (2003).

Petitioner raises four grounds for relief.  First, Petitioner argues that Respondents have abrogated their duty to provide for Petitioner's health and safety due to the COVID-19 pandemic, warranting his immediate release.  Petitioner also argues that his prolonged detention without a bond hearing violates procedural due process.  He also argues that his detention violates procedural due process because he has viable defenses to removal.  Lastly, Petitioner asserts a substantive due process violation, alleging that there is no reasonable relation between his detention and a government interest.

## A.  Risk to Petitioner's Health and Safety

Petitioner argues that his continued detention threatens his safety and well-being amid the global pandemic of COVID-19.  Petitioner is 36 years old and has a "lengthy history of smoking."  (Doc. 1, at 14).  Petitioner alleges that he has underlying health conditions, including

obesity and colorectal bleeding.  *Id*.  He also alleges that he suffers from pre-diabetes and high cholesterol.  *Id*.

The Court recognizes that some courts have found that an argument regarding the conditions posed by COVID-19 must be brought in a civil rights action, while others have found that it is properly raised in a habeas petition.  *See, e.g., Aguayo v. Martinez*, Civil Action No. 1:20-cv-00825-DDD-KMT, 2020 WL 2395638, *2 (D. Colo. May 12, 2020) (finding that the court lacked jurisdiction over request for immediate release based on COVID-19 because "a conditions-of-confinement claim cannot be asserted in a petition for habeas corpus under binding Tenth Circuit precedent") (citing *Palma-Salazar v. Davis*, 677 F.3d 1031, 1035 (10th Cir. 2012)); *Archilla v. Witte*, No. 4:20-cv-00596-RDP-JHE, 2020 WL 2513648, at *19 (N.D. Ala. May 15, 2020) (noting that petitioners, who are seeking release from ICE custody due to the COVID-19 outbreak, are trying to shoehorn a conditions-of-confinement claim under section 2241); *cf. Ruderman v. Kolitwenzew*, Case No. 20-cv-2082, 2020 WL 2449758, at *7 (C.D. Ill. May 12, 2020) (finding that "[c]ourts across the country addressing similar claims of civil immigration detainees during the COVID-19 pandemic have found that such a claim can proceed in a habeas corpus petition) (collecting cases).  However, the Court finds that even considering Petitioner's arguments for immediate release due to the conditions posed by COVID-19, Petitioner has not shown that his immediate release is warranted in this case.

First, the Court notes that many courts have found that release is warranted due to a petitioner's particular vulnerabilities or health conditions.  *See, e.g., id.* at *13 ("while for most individuals, JCDC's measures would likely be more than sufficient to survive a due process challenge, Petitioner's unique medical conditions place him at an increased risk of serious illness or death"); *Fraihat v. U.S. Immigration and Customs Enforcement*, ___ F. Supp. 3d ___, 2020

12

WL 1932570, at *29, n.20 (C.D. Cal. April 20, 2020) (granting preliminary injunction and emergency motion to certify subclasses and defining risk factors as "being over the age of 55; being pregnant; or having chronic health conditions, including: cardiovascular disease . . .; high blood pressure; chronic respiratory disease . . .; diabetes; cancer; liver disease; kidney disease; autommimune diseases . . .; severe psychiatric illness; history of transplantation; and HIV/AIDS"); *see also ERO COVID-19 Pandemic Response Requirements* (issuing guidance and directing the ERO field offices to review custody of the following subgroups: (1) pregnant detainees or those who have delivered within the prior two-weeks; (2) detainees over 60 years old; (3) detainees having any chronic illness that may make them immune-compromised, including but not limited to, blood disorders, chronic kidney disease, compromised immune systems, endocrine disorders, metabolic disorders, heart disease, lung disease, and/or neurological or neurodevelopmental disorders).

However, Petitioner's alleged health concerns do not place him in any of the categories described in the ERO's PRR and Petitioner does not have any medical or psychiatric diagnoses that implicate the class or subclass defined in *Fraihat*. In addition, the Court is not persuaded that the conditions at the CCJ warrant Petitioner's immediate release. While courts have ordered immediate release or have ordered that extra precautions be taken, in this case it appears that the CCJ is taking appropriate precautions. *See, e.g., Thakker v. Doll*, No. 1:20-cv-480, ___ F. Supp. 3d ___, 2020 WL 2025384 (M.D. Pa. April 27, 2020) (where immigration detainees each suffered from chronic medical conditions and faced an increased risk of death or serious injury if exposed to COVID-19, continuation of release was granted for three detainees at facility that already had 40 confirmed cases of the virus, and was denied for seven detainees who had

committed violent offenses or were being held in facilities without any known cases of COVID-19, or facilities with enhanced prevention measures).

Even if Petitioner's claim could be properly considered in a habeas petition, Petitioner has not shown that the CCJ failed to take adequate steps to ensure Petitioner's health and safety in light of the COVID-19 pandemic. Furthermore, considering Plaintiff's health and his failure to show that he faces a significant risk of contracting COVID-19, his request for immediate release is unwarranted.

## B. Due Process

Petitioner argues that his prolonged detention without a bond hearing violates procedural due process. He has been detained since July 2019, and during his detention, no neutral decisionmaker has conducted a hearing to determine if his lengthy detention is warranted due to him either being a danger to the community or a flight risk. Petitioner also argues that his viable defenses to removal render his detention unconstitutional. While Petitioner acknowledges that DHS has authority to detain individuals in removal proceedings, he argues that a substantive due process violation arises where there is no reasonable relation between an individual's detention and a government interest. (Doc. 1, at 13.) Petitioner argues that "[t]he fact that [he] will not likely be removed defeats the government's justification for his continued detention." *Id*. Petitioner argues that absent a strong special justification, prolonged detention under § 1226(c) runs afoul of due process requirements. *Id*.

Respondents argue that although Petitioner has previously been lawfully admitted to the United States and gained legal permanent resident status, he may still be considered an "arriving alien" after departing the United States and seeking reentry, and thus, may be detained under 8 U.S.C. § 1225(b). *See Schubler v. Holder*, 472 F. App'x 867, at *1 n.1 (10th Cir. 2012)

(unpublished) (noting that lawful permanent resident that briefly left the country applied for admission as an arriving alien because "[d]espite her LPR status, Schubler was considered an alien seeking admission to the United States because she had committed an offense identified in 8 U.S.C. § 1182(a)(2)") (citing 8 U.S.C. § 1101(a)(13)(C)(v)); *Othi v. Holder*, 734 F.3d 259, 267 (4th Cir. 2013) (LPR who had committed offenses enumerated in Section 1182(a)(2) is excluded from the exemption granted to LPRs from admission status and is treated as "seeking admission into the United States," just as are all other aliens entering the country).

Respondents argue that while generally under 8 U.S.C. § 1101(a)(13)(C)(v), "an alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws," Congress provided an exception to this general rule where the alien "has committed an offense identified in section 1182(a)(2) of this title, unless since such offense the alien has been granted relief under section 1182(h) or 1229b(a) of this title."  (Doc. 4, at 16–17) (citing 8 U.S.C. § 1101(a)(13)(C)(v)). Deportation Officer Charles Wekamp declared that "[b]ecause the Petitioner's conviction is an offense identified under 8 U.S.C. § 1182(a)(2), he was regarded as an arriving alien seeking an admission into the United States pursuant to 8 U.S.C. § 1101(a)(13(C)(v)."  Wekamp Decl., ¶ 10. Wekamp also declares that "[a]s of the date of this Declaration, Petitioner remains in the custody of ERO, detained pursuant to 8 U.S.C. § 1225(b)(2)(A) and housed at the Chase County Jail." Wekamp Decl., ¶ 38.  In a footnote, Wekamp notes that "[w]hile petitioner is detained pursuant to 8 U.S.C. § 1225(b) as an arriving alien, he is likewise subject to mandatory detention pursuant to 8 U.S.C. § 1226(c)."  *Id*. at n.3.

Petitioner does not address whether he is an "arriving alien" but argues that he is being detained under 8 U.S.C. § 1226(c), rather than § 1225(b), and that the result should be the same

whether he is detained under § 1225(b)(2) or § 1226(c).   (Doc. 5, at 2–3.)   Respondents acknowledge that arriving aliens detained under § 1225(b) have more limited due process protections than those afforded under § 1226(c), but argue that the distinction does not matter in this case because Petitioner cannot show that his detention infringes on the due process rights afforded in either circumstance.  (Doc. 4, at n.4.)

      If Petitioner is an arriving alien, he has received all the process he is due.  This Court has recently held that the applicable statutory process shapes an arriving alien's procedural due-process rights and therefore they have no statutory right to release or a bond hearing.  *See de la Rosa Espinoza v. Guadian*, Case No. 20-3126-JWL, 2020 WL 3452967 (D. Kan. June 24, 2020). The United States Supreme Court has also recently stated that:

> In 1892, the Court wrote that as to "foreigners who have never been naturalized, nor acquired any domicile or residence within the United States, nor even been admitted into the country pursuant to law," "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law."  *Nishimura Ekiu*, 142 U.S., at 660.  Since then, the Court has often reiterated this important rule.  See, *e.g., Knauff*, 338 U.S., at 544 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"); *Mezei*, 345 U.S., at 212 (same); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative").
>
>     Respondent argues that this rule does not apply to him because he was not taken into custody the instant he attempted to enter the country (as would have been the case had he arrived at a lawful port of entry).  Because he succeeded in making it 25 yards into U.S. territory before he was caught, he claims the right to be treated more favorably.   The Ninth Circuit agreed with this argument.
>
>     We reject it.  It disregards the reason for our century-old rule regarding the due process rights of an alien seeking initial entry.  That rule rests on fundamental propositions: "[T]he power to admit or exclude aliens is a sovereign prerogative," *id.*, at 32; the Constitution gives "the political department of the government"

plenary authority to decide which aliens to admit, *Nishimura Ekiu*, 142 U.S., at 659; and a concomitant of that power is the power to set the procedures to be followed in determining whether an alien should be admitted, see *Knauff*, 338 U.S., at 544.

This rule would be meaningless if it became inoperative as soon as an arriving alien set foot on U.S. soil. When an alien arrives at a port of entry—for example, an international airport—the alien is on U.S. soil, but the alien is not considered to have entered the country for the purposes of this rule. On the contrary, aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are "treated" for due process purposes "as if stopped at the border." *Mezei*, 345 U.S., at 215; see *Leng May Ma v. Barber*, 357 U.S. 185, 188–190 (1958); *Kaplan v. Tod*, 267 U.S. 228, 230–231 (1925).

The same must be true of an alien like respondent. As previously noted, an alien who tries to enter the country illegally is treated as an "applicant for admission," § 1225(a)(1), and an alien who is detained shortly after unlawful entry cannot be said to have "effected an entry," *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). Like an alien detained after arriving at a port of entry, an alien like respondent is "on the threshold." *Mezei*, 345 U.S., at 212. The rule advocated by respondent and adopted by the Ninth Circuit would undermine the "sovereign prerogative" of governing admission to this country and create a perverse incentive to enter at an unlawful rather than a lawful location. *Plasencia*, 459 U.S., at 32.

For these reasons, an alien in respondent's position has only those rights regarding admission that Congress has provided by statute. . . .

*DHS v. Thuraissigiam*, No. 19-161, slip op. at 34–36, 591 U.S. ___ (June 25, 2020). Therefore, if Petitioner is an "arriving alien" detained under § 1225(b) he is not entitled to a bond hearing.

Petitioner argues that he is detained under § 1226(c). Section 1226(c) sprang from a "concer[n] that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers." *Nielsen v. Preap*, 139 S. Ct. 954, 960 (2019) (quoting *Demore*, 538 U.S. at 513). "To address this problem, Congress mandated that aliens who were thought to pose a heightened risk be arrested and detained without a chance to apply for release on bond or parole." *Id*. The Supreme Court has held that "both of subsection

(c)'s mandates—for arrest and for release—apply to any alien linked with a predicate offense identified in subparagraphs (A)–(D), regardless of exactly when or even whether the alien was released from criminal custody." *Id*. at 971 (noting that respondents did not raise a constitutional argument).

In *Demore*, the Supreme Court noted that it was "well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." 538 U.S. at 523 (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)).  But it also held that mandatory detention for the "limited period" necessary for removal proceedings is constitutional.  *Demore*, 538 U.S. at 529–31.  In doing so, the Supreme Court reasoned that detention under § 1226(c) during removal proceedings "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed."  *Id*. at 528.  It further reasoned that, unlike the "indefinite" and "potentially permanent" post-removal-period detention contemplated in *Zadvydas*, detention during an alien's removal proceeding has "a definite termination point," namely, the conclusion of the removal proceeding, and generally lasts for a "limited period" of time.  *Demore*, 538 U.S. at 529–30 (quoting *Zadvydas*, 533 U.S. at 690–91).

In *Jennings v. Rodriguez*, the Supreme Court noted that "U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). . . [and] also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)."  *Jennings v. Rodriguez*, 138 S. Ct. 830, 838 (2018).  "Section 1226(c) in turn states that the Attorney General 'shall take into custody any alien' who falls into one of the enumerated categories involving criminal offenses and terrorist activities."  *Id*. at 846 (citing 8 U.S.C. § 1226(c)(1)).  The Supreme Court

noted that detention under § 1226(c) has "'a definite termination point'; the conclusion of removal proceedings". . . [and] that 'definite termination point'—and not some arbitrary time limit devised by courts—marks the end of the Government's detention authority under § 1226(c)." *Id.* (citing *Demore v. Kim*, 538 U.S. 510, 529 (2003)).  The Supreme Court declined to consider respondents' constitutional arguments.  *Id.* at 851.

After the decisions in *Demore* and *Jennings*, courts have addressed the constitutional arguments in determining when an alien's prolonged mandatory detention under § 1226(c) becomes unconstitutionally prolonged.  *See Smith v. Barr*, ___ F. Supp. 3d ___, 2020 WL 1250825, at *9 (N.D. Okla. March 16, 2020) (stating that several courts have concluded that because *Demore* relied on incorrect data regarding the average length of time for completion of removal proceedings, it does not address the question of when detention becomes unconstitutionally prolonged) (citing *Singh v. Choate*, No. 19-CV-00909-KLM, 2019 WL 3943960, at *4 (D. Colo. Aug. 21, 2019) (unpublished); see also *Chairez-Castrejon v. Bible*, 188 F. Supp. 3d 1221, 1225–26 (D. Utah 2016) (noting that *Demore*'s holding was limited and discussing split among circuit courts as to the best method to analyze reasonableness of prolonged mandatory detention during removal proceedings).

Petitioner argues that his detention is unreasonable in light of his viable defense to removal.  Petitioner believes that his conviction on a theft charge is void and because his sentence in that case was merged with his sentence in his drug case as part of his plea, if he is successful in voiding that judgment "the basis for his removal is non-existent."  (Doc. 5, at 4–6.) Petitioner's post-conviction petition in Case No. 2008CF002470 was dismissed on January 9, 2020.[6]  Petitioner filed a Notice of Appeal (docketed as late) on May 27, 2020, and a Petition for

---

[6] *See State v. Bataineh*, Case No. 2008CF002470 (Will County, Illinois); https://ipublic.il12th.org/Events.php (last visited June 30, 2020).

Relief from Void Judgment on June 3, 2020.  While not dispositive, some courts have considered the likelihood that the removal proceedings will result in a final order of removal as a factor in determining the reasonableness of prolonged detention.

The court in *Smith* found that several courts post-*Jennings* "have continued to analyze the reasonableness of prolonged mandatory detention under § 1226(c), on a case-by-case basis, by considering the following factors:"

> (1) the total length of detention to date; (2) the likely duration of future detention; (3) the conditions of detention; (4) delays in the removal proceedings caused by the detainee; (5) delays in the removal proceedings caused by the government; and (6) the likelihood that the removal proceedings will result in a final order of removal.

*Smith*, 2020 WL 1250825, at *9 (citing *Singh*, 2019 WL 3943960, at *5 (quoting *Jamal A. v. Whitaker*, 358 F. Supp. 3d 853, 858–59 (D. Minn. 2019)); *see also Borbot v. Warden Hudson Cty. Corr. Facility*, 906 F.3d 274, 279 (3d Cir. 2018) (noting that *Jennings* did not impact the Third Circuit's "constitutional holding in *Diop* that detention under § 1226(c) may violate due process if unreasonably long" or its holding "that due process entitles § 1226(c) detainees to a bond hearing at some point, with the exact time varying with the facts of the case"); *Thompson v. Horton*, No. 4:19-CV-00120-AKK-HNJ, 2019 WL 4793170, at *5 n.7 (N.D. Ala. Aug. 26, 2019) (unpublished) (collecting cases decided after *Jennings* that consider as-applied due process challenges to § 1226(c)).

The petitioner in *Aguayo v. Martinez*, who was mandatorily detained under § 1226(c), argued that his nine-month detention without bond violated his right to due process under the Fifth Amendment to the Constitution.  *Aguayo v. Martinez*, Civil Action No. 1:20-cv-00825-DDD-KMT, 2020 WL 2395638, *3 (D. Colo. May 12, 2020).  The court held that petitioner's argument runs counter to *Demore*.  *Id*.  The court held that "[u]nder *Demore*, detention without

bond under Section 1226(c) is a constitutionally permissible aspect of the removal proceedings." *Id.* (citing *Demore*, 538 U.S. at 531). The court also found that Mr. Aguayo's prolonged detention was largely of his own making where he had requested—and been granted—eight continuances of his removal proceedings to permit his parallel application for an adjustment of status to be resolved before any final order of removal was entered. *Id.* The court refused to apply a multi-factor balancing test, finding that:

> While the specific holding of *Demore* was that the Ninth Circuit erred in holding that six months of pre-removal detention under Section 1226(c) was presumptively illegal, its holding was broader than the underlying facts: "detention during removal proceedings"—even longer-than-average detention—"is a constitutionally permissible part of that process" so long as there is no evidence that the government isn't improperly or arbitrarily delaying removal. 538 U.S. at 531. Indeed, the Supreme Court has since explained that detention under Section 1226(c) is constitutional because it is necessarily limited—it ends at the conclusion of removal proceedings. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 846 (2018) (noting that in *Demore*, the Court held that "[Section] 1226(c) has 'a definite termination point': the conclusion of removal proceedings."). Given this, the Supreme Court has warned lower courts not to graft "some arbitrary time limit" onto pre-removal detention under Section 1226(c). *Id.* Perhaps it's possible that detention under Section 1226(c) might become unreasonable if the government, say, arbitrarily extends or suspends detention or removal proceedings. *See Demore*, 538 U.S. at 531–32 (Kennedy, J., concurring) (noting that a bond hearing might be required if "continued detention became unreasonable or unjustified"); *see also Singh*, 2019 WL 3943960, at *4 (relying on Justice Kennedy's concurrence in *Demore* to craft a multi-factor balancing test).[] But Mr. Aguayo's detention continues to be tethered to the government's legitimate interest in detaining him during his removal proceedings. *See Id.* at 512. He offers arguments why he shouldn't be removed and why he is being held improperly under Section 1226(c) without bond. But those arguments don't undermine the rule announced in *Demore*— detention of criminal alien is permissible as long as the government is pursuing removal. And as explained, it appears that much of the delay is due to Mr. Aguayo's own actions, not the government's.[] Nine months is a long time for a removal process, to be sure. But in these circumstances, it is not unconstitutional.

*Aguayo*, 2020 WL 2395638, at *4.

The Petitioner in this case, like the petitioner in *Aguayo*, has created much of the delay in his removal proceedings by seeking continuances pending a decision on his requests for post-conviction relief in his underlying criminal case.  The court in *Aguayo* noted that it appeared Mr. Aguayo, by delaying removal proceeding, was hoping to get a favorable decision on his visa application before removal was accomplished, and while that was "an understandable strategy for him to choose, [ ] he cannot then complain about the length of detention that choice has caused." *Id*. at n.2.

Petitioner has not shown that his detention under § 1226(c) has become unreasonable or unjustified.  Although the Court is concerned with the length of his detention, Petitioner has not suggested that the government has unreasonably delayed his removal proceedings.  Petitioner has appealed to the BIA and briefs were due on June 30, 2020.  The government is still pursuing removal and Petitioner's detention "continues to be tethered to the government's legitimate interest in detaining him during his removal proceedings."  Petitioner has failed to show that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).

**IT IS THEREFORE ORDERED BY THE COURT** that the petition is **denied.**

**IT IS SO ORDERED**.

**Dated July 1, 2020, in Kansas City, Kansas.**


**S/ John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**